IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Diana L. Rieth, | ) | Case No. 1:16-cv-574-BYP |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.  Introduction

Plaintiff, Diana L. Rieth ("Rieth"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits and Disability Insurance Benefits under Title XVI of the Social Security Act ("Act"). This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).  The record shows that portions of the decision of the Commissioner are not based on substantial evidence.  It is recommended that the final decision of the Commissioner be VACATED and the case be REMANDED for further proceedings as described below.

## II.  Procedural History

Diana Rieth applied for supplemental security income and disability insurance benefits in April 2012.  (Tr. 21)  She alleged that her disability began on February 19, 2009. (Tr. 286)  The application was denied initially on July 24, 2012 (Tr. 181) and after reconsideration on

November 15, 2012. (Tr. 191)  On January 8, 2013, Ms. Rieth requested an administrative hearing. (Tr.198)        A hearing was held before the Administrative Law Judge ("ALJ"), Penny Loucas, on October 11, 2013 (Tr. 93-152) followed by a supplemental hearing on March 26, 2014.  (Tr. 42-92)  The ALJ issued a decision on August 22, 2014 finding that Ms. Rieth was not disabled. (Tr. 18-41)  Ms. Rieth requested a review of the hearing decision on September 11, 2014. (Tr. 17)  On January 10, 2016, the Appeals Council denied review, rendering the ALJ's conclusion the final decision of the Commissioner. (Tr. 1-7)

On March 9, 2016, Rieth appealed the ALJ's final decision in this court. (ECF Doc. No. 1)  Defendant answered and filed the transcript of the administrative proceedings on June 7, 2016.  (ECF Doc. Nos. 7 and 8)  Ms. Rieth filed a brief on the merits on July 7, 2016 (ECF Doc. No. 10) and Defendant filed her brief on the merits on September 6, 2016 (ECF Doc. No. 12), making the matter ripe for review.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Diana Rieth was born in 1962 and was 46 years old on the date of the alleged onset of her disability.  (Tr. 286)  She has some college credits and past work as a deburrer, a stock selector, a production assembler and a forklift operator.  (Tr. 138-139)

### B.     Medical Evidence

#### 1.     Relevant Evidence Regarding Plaintiff's Physical Limitations

Plaintiff has been treating with Michelle Riley, D.O. since at least 2010 for back pain. (Tr. 407)  Plaintiff underwent a lumbar spine MRI on June 1, 2010 which revealed multilevel disc bulging and a broad based disc herniation, an annular tear, and mild neuroforaminal stenosis at the L4-L5 level. (Tr. 1129)

Plaintiff presented to Westshore Primary Care on September 23, 2010 with a spider bite on her left leg. (Tr. 458)  The physician who saw her prescribed Lotrisone. (Tr. 458)

Plaintiff returned to Westshore on January 12, 2011 complaining of fatigue, vertigo, nausea and fever. (Tr. 456)  Dr. Riley ordered laboratory studies and prescribed Anitvert.  (Tr. 456)  Plaintiff returned on January 26, 2011.  (Tr. 455)  She had developed a cold after her last visit and continued to complain of fatigue and lightheadedness. (Tr. 455)  Dr. Riley prescribed Zithromax.  (Tr. 455)

Ms. Rieth returned to see Dr. Riley on March 30, 2011 complaining that she was continuing to get sick and sleep a lot.  (Tr. 453)  Dr. Riley prescribed Augmentin and ordered a chest x-ray and blood work.  (Tr. 453)  In April, plaintiff returned to Dr. Riley and continued to complain of fever and fatigue.  (Tr. 452)  Dr. Riley noted that the cause of these symptoms was unclear. (Tr. 452)

Plaintiff was referred to a neurologist, Dr. Dhruv Patel, who evaluated plaintiff in October 2011.  Plaintiff was being evaluated for Lyme disease. (Tr. 600)  She told Dr. Patel that she had been treated for Lyme disease ten years ago and felt that she was having symptoms that could be related to it. (Tr. 600)  She reported numbness on the right side of her face and some leg numbness. (Tr. 600)  She reported poor memory at times and increased headaches in the last year. (Tr. 600)   Physical examination revealed mild tenderness of the musculature but no significant tender points.  (Tr. 602)  Dr. Patel referred plaintiff for multiple tests (Tr. 602)  Laboratory tests did not suggest any polymyalgia rheumatica, her CPK levels were normal, she had normal vitamin levels, and her thyroid function tests and her Lyme Titer profile were normal. (Tr. 603)  Dr. Patel also referred plaintiff to Richard Litwin, Ph.D., for a neuropsychological evaluation, which took place on November 2, 2011.  (Tr. 729-731)

On October 20, 2011, plaintiff underwent a brain MRI, an electroencephalogram and an electromyogram. (Tr. 462-467)  The electromyogram revealed isolated denervation changes in the S1 distribution on the left suggestive of a subtle foraminal stenosis.  (Tr. 462-464)

Ms. Rieth returned to Dr. Patel on November 22, 2011.  (Tr. 597)  Dr. Patel opined that plaintiff's symptoms did not fit into one anatomical category. (Tr. 599)  He thought that her symptoms were mostly related to her underlying bipolar disorder as well as multiple issues including sleep deprivation and past head injuries. (Tr. 599)  He referred her to the Cleveland Clinic for further evaluation and recommended that she obtain a second opinion regarding her fevers and Lyme disease. (Tr. 599)  Dr. Patel indicated he was unsure of whether Lyme disease could be chronic, and stated he was "not an expert at this."  (Tr. 599)

In January 2012, Dr. Riley referred plaintiff to Christine Koval, M.D. for an infectious disease consultation.  (Tr. 437)  Dr. Koval opined that Ms. Rieth did not have any of the classic findings for primary or secondary Lyme disease but ordered laboratory studies for Lyme and syphilis to confirm.  (Tr. 439)  Both sets of laboratory findings were negative. (Tr. 441)

Plaintiff followed-up with Dr. Riley on January 30, 2012 complaining of continued rash, fever, memory loss, fatigue and neuropathy.  (Tr. 448)  Dr. Riley had an "extensive discussion" with plaintiff and her husband and recommended that she research a "Lyme literate" doctor to whom she could be referred. (Tr. 448)

Ms. Rieth returned to Dr. Riley on August 17, 2012 and informed her that she was seeking treatment with another physician for chronic Lyme disease, heavy metal buildup, and herpes 6 and reported some improvement of her symptoms. (Tr. 760)

On Dr. Riley's referral, plaintiff presented to Dr. Osama Malak for an evaluation on June 8, 2010. (Tr. 407)  Plaintiff reported low back pain with worsening right buttock pain as well as

4

left leg pain. (Tr. 407) Dr. Malak noted that plaintiff's right sacroiliac joint was tender to compression; examination of the lumbar spine showed minimal tenderness in the midline; there was moderate to severe tenderness over the piriformis muscle; and she was positive for Patrick's test on the right side. (Tr. 410) Dr. Malak ordered a right sacroiliac joint injection, which he performed on July 12, 2010. (Tr. 410-411)

Ms. Rieth returned to see Dr. Malak on August 10, 2010 and reported slight improvement in her back pain. (Tr. 413) She estimated her low back pain as a 3/10. She reported that her left leg pain had recovered and she was not having any more problems with her left leg. (Tr. 413) Dr. Malak recommended a repeat right sacroiliac injection, which was performed on August 23, 2010. (Tr. 415-416) Plaintiff saw Dr. Malak again on October 6, 2010, reporting that she continued to have mild low back pain. (Tr. 417) She continued to estimate her pain as 3/10. (Tr. 417) Dr. Malak prescribed Voltaren, ordered a TENS unit, and recommended a repeat injection. (Tr. 420) Plaintiff started physical therapy on October 11, 2010. (Tr. 1107) She underwent another right sacroiliac injection on July 14, 2011. (Tr. 425) On August 10, 2011, Ms. Rieth returned to Dr. Malak due to worsening back pain. (Tr. 421) Physical examination findings were unchanged. (Tr. 423) The doctor ordered another right sacroiliac joint injection, which was performed on September 2, 2011. (Tr. 426) She underwent a third injection on May 25, 2012. (Tr. 428) Dr. Malak completed a Lumbar Spine Impairment Questionnaire summarizing Ms. Rieth's conditions on June 13, 2012. (Tr. 1054-1060)

Ms. Rieth established care with Dr. Phillip DeMio on March 6, 2012 and reported her medical history. (Tr. 489-493) Ms. Rieth sought treatment with Dr. DeMio because she believed that he was a "Lyme-literate" physician. (Tr. 112, 533) Ms. Rieth visited Dr. DeMio on April 10, 2012. At this appointment, she reported that her energy level had improved a little

bit by taking Vitamin B12, but that her pain had not improved.  (Tr. 493)  Dr. DeMio increased

her dosage of Vitamin B12, ordered laboratory studies and recommended other treatments.  (Tr.

494)  On May 14, 2012, Ms. Rieth reported more energy and better control of anxiety and mood.

(Tr. 495)  Dr. DeMio's notes reflect that plaintiff presented with a slightly subdued appearance

and that she had modestly heightened transmission of breath sounds.  (Tr. 496-497)  Dr. DeMio

increased plaintiff's dosage of Vitamin B12, changed the dosages of various supplements, and

ordered laboratory studies.  (Tr. 497-498)  He also prescribed Valtrex and noted that he would

later rotate plaintiff's antibiotics.  (Tr. 498)  Many laboratory and urine studies, including toxic

metal analysis and tests for various parasites were performed in March through May 2012 and

returned normal results.  (Tr. 500-532)  Lyme IgG Western Blot testing was performed twice on

March 9, 2012; the first test was indeterminate and the second test was negative.  (Tr. 530-531)

Ms. Rieth followed-up with Dr. DeMio on June 20, 2012, July 17, 2012, August 20,

2012, October 1, 2012, and October 17, 2012.  (Tr. 781-791)  Dr. DeMio ordered more

laboratory studies and wrote a short letter confirming that he was treating Ms. Rieth.  (Tr. 732-

743, 770)  In this letter, Dr. DeMio stated that plaintiff came to him for the treatment of chronic

Lyme disease; that she had been unable to work due to chronic pain, fatigue, and memory

impairment; and that she was unable to sit or stand for 6 hours or longer due to severe back and

joint pain.  (Tr. 770)  Ms. Rieth continued to see Dr. DeMio into 2013 and remained compliant

with his program which included a combination of vitamins, supplements, and antibiotics.  (Tr.

792-818, 1005-1110)  Dr. DeMio continued to order more laboratory tests.  (Tr. 923-932, 1038-

1049)  On June 18, 2013, Dr. DeMio completed a Lyme Disease Impairment Questionnaire.  (Tr.

744-752)  The questionnaire responses indicated Rieth would be unable to tolerate even low

stress work jobs. (Tr. 750)  The responses also reported the doctor's opinion that she could sit and stand or walk for an hour or less per eight hour work day. (Tr. 749)

At Dr. DeMio's direction, a peripherally inserted central catheter ("PICC") line was implanted on plaintiff on August 13, 2013.  (Tr. 1144)  Once the PICC line was installed, Dr. DeMio began prescribing IV medications, including Rocephin and Zithromax, he also prescribed oral Plaquenil and Rifampin.  (Tr. 1012-1013)

On October 28, 2013, Dr. DeMio changed the Zithromax IV prescription to Glutathione. (Tr. 1273)  He also wrote a letter that day, stating that he was treating Ms. Rieth for Lyme disease and that his diagnosis was based on, " a bull's eye rash (well documented by a doctor and well described by patient and  by her husband), other additional rashes fit Lyme diagnosis, she has cognitive dysfunctions including short and long term amnesia, neurogenic pain, mental and physical fatigue, along with migratory arthralgia, test results, other causes had been ruled out, and the patient had partial responses to the antibiotics specific for Lyme disease."  (Tr. 1150)

On November 5, 2013, Ms. Rieth underwent an electromyogram for right hand tremors. (Tr. 1135)  The results were too limited to be diagnostic of any entity but showed a possible, chronic, mild residual of an old right C8 radiculopathy.  (Tr. 1135)  Ms. Rieth returned to Dr. DeMio on November 26, 2013 complaining of continued fatigue and heart palpitations.  (Tr. 1276)  Dr. DeMio continued to order laboratory studies throughout plaintiff's treatment.  (Tr. 1285-1299, 1328-1384)

Dr. DeMio referred plaintiff to Trilok Sharma, M.D. for her heart palpitations.  (Tr. 1166-1167)  An EKG performed during the visit showed frequent premature ventricular contractions. ("PVCs").  (Tr. 1168)  Dr. Sharma ordered multiple additional cardiac tests and recommended that plaintiff check with Dr. DeMio to see if any prescribed medications could be causing her

cardiac symptoms.  (Tr. 1167)  Plaintiff wore a Holter monitor on February 12, 2014, which

revealed periods of sinus tachycardia and extremely frequent PVCs.  (Tr. 1169)  Plaintiff

followed up with Dr. Sharma on March 3, 2014 and reported numbness in her fingers and toes.

(Tr. 1409)  Dr. Sharma noted that her treatment over the past two years with Dr. DeMio had

included "extremely high doses of antibiotics, antiparasitic and antifungal drugs."  (Tr. 1409)  He

opined that the high toxicity from the drugs she was taking could possibly be causing her

palpitations.  (Tr. 1409)

 Plaintiff returned to Dr. DeMio on March 17, 2014 for refills of her prescriptions and

reported symptoms of foggy cognition, noise sensitivity, fatigue, lower extremity pain, tunnel

vision, cough and body pain.  (Tr. 1311-1317)  Following this appointment, Dr. DeMio authored

another letter stating that plaintiff's chest pains and palpitations contributed significantly to her

disabling symptoms and that they were expected to persist indefinitely.  (Tr. 1177)

 On May 7, 2014, Rieth told Dr. DeMio that Dr. Sharma had told her to stop seeing Dr.

DeMio.  (Tr. 1319)  Dr. DeMio's examination findings included ridged nails and rare pulse

irregularity. (Tr. 1318)

 On June 2, 2014, Ms. Reith returned to Dr. Sharma, who noted that her PICC line had

been replaced with a port implanted in her subclavicular area and that she was on a combination

of over 30 medications and supplements.  (Tr. 1404)  Dr. Sharma's notes state that "patient is

convinced that she has chronic Lyme disease.  She does not want any opinion from any other

doctor about her Lyme disease."  (Tr. 1406)  Dr. Sharma prescribed Metropolol, a beta blocker.

(Tr. 1406)  On June 27, 2014, he continued Metropolol and added Flecainide Acetate for Ms.

Reith's PVCs.  (Tr. 1407, 1459)

On August 1, 2014, Ms. Rieth visited Dr. Sharma. (Tr. 1456) At this appointment she reported that she was unable to lie flat and that she was still feeling ectopic beats. (Tr. 1456) Dr. Sharma's exam revealed bigeminal ectopic beats and irregular rhythm. (Tr. 1456) Dr. Sharma considered plaintiff marginally improved and ordered an updated Holter monitor study. (Tr. 1457)

Ms. Rieth returned to Dr. DeMio on September 2, 2014. (Tr. 1323-1326) She reported little change in her symptoms and he refilled her prescriptions. (Tr. 1323-1326)

On November 18, 2014, Ms. Rieth followed-up with Dr. Sharma. (Tr. 1436-1437) Her PVCs were less frequent and she reported improvement of her cardiac symptoms. (Tr. 1436-1437) He adjusted and refilled her prescriptions. (Tr. 1437)

### 2. Relevant Evidence Regarding Plaintiff's Mental Condition

Plaintiff began treating with Dr. Diab Almhana, M.D. in December 2006. (Tr. 676) On April 5, 2011, Ms. Rieth reported that her anxiety symptoms had worsened. (Tr. 474) Dr. Almhana diagnosed adjustment disorder with anxiety as well as bipolar I, most recent episode depressed, in full remission. (Tr. 474) Dr. Almhana prescribed Lamictal and Wellbutrin. (Tr. 474) Ms. Rieth followed-up with Dr. Almhana on June 13, 2011. She reported that her anergia and anhedonia had worsened and that her anger or angry episodes had increased in frequency and intensity. (Tr. 476) Dr. Almhana provided psychotherapy and refilled plaintiff's prescriptions. (Tr. 477) On September 29, 2011, Ms. Rieth reported fatigue, memory loss, and numbness. (Tr. 478) She told Dr. Almhana that she possibly had Lyme disease and that it was impairing her ability to work and function. (Tr. 478) Dr. Almhana's notes indicate that plaintiff was glum, attentive, fully communicative, casually groomed, tense and slow to respond. (Tr. 478) Dr. Almhana further noted that plaintiff's demeanor was sad; that she appeared listless,

9

fatigued, downcast and near tears.  (Tr. 478)  In his notes, Dr. Almhana described plaintiff's
cognitive functioning and memory as intact.  (Tr. 476, 478, 480, 482, 484, 486, 776, 778)  Dr.
Almhana prescribed Provigil in addition to the other medications that Ms. Rieth was taking. (Tr.
478)  Ms. Rieth followed up on December 15, 2011.  (Tr. 480-481)  Her mental status was
unchanged. (Tr. 480)  Dr. Almhana decreased plaintiff's dosage of Lamictal, continued
Wellbutrin, changed Provigil to Nuvigil, continued Xanax, and changed Lunesta to Ambien.  (Tr.
480-481)  Dr. Almhana completed a Psychiatric/Psychological Impairment Questionnaire on
July 10, 2012.  (Tr. 676-683)

Ms. Rieth returned to Dr. Almhana on August 8, 2012 with similar symptoms and
relatively unchanged mental status.  (Tr. 776)  Dr. Almhana continued plaintiff's medications
and noted that her prognosis was guarded; she was taking close to 20 medications and required
monthly visits to limit relapse of depression and mood changes.  (Tr. 776-777)  Mental status
examinations remained unchanged in visits in November 2012 and April 2013.  (Tr. 778-779)
Dr. Almhana provided two narrative letters restating his opinions from the July 2012
questionnaire. (Tr. 1301-1302).  Dr. Almhana completed a different Mental Impairment
Questionnaire on March 12, 2015.  (Tr. 1399-1403)

Ms. Rieth also met with Richard Litwin, Ph.D., on November 2, 2011, for a
neuropsychological evaluation, on a referral from Dr. Patel.  (Tr. 729-731)  She reported fatigue,
an increased need to write things down, "weird feelings in the head" and general malaise.  (Tr.
729)  Psychological testing revealed an IQ of 92, moderate to severe impairment in immediate
recall, borderline impairment in delayed memory, moderate impairment on the Boston Naming
Test and Trails B test, and inability to perform the Wisconsin Card Sort Test. (Tr. 730)  Dr.
Litwin opined that the testing strongly suggested impairment in the prefrontal and ventral frontal

lobes along with damage to the temporal lobes.  (Tr. 730)  He suspected that plaintiff may have suffered repeated traumatic encephalopathy and noted that stress and any type of prolonged fatigue/chronic pain could cause acute exacerbations of her baseline functioning. (Tr. 731)  He recommended serial neuropsychological testing. (Tr. 731)

Plaintiff had a second consultation with Dr. Litwin on October 29, 2013.  (Tr. 1262-1264) Testing revealed low average performance on immediate recall and moderate impairment with Trails B testing. (Tr. 1263)  Dr. Litwin opined that Ms. Rieth showed improvement in certain memory functions but that her depression and anxiety were unchanged with a possible increase in affective disease. (Tr. 1264)  Dr. Litwin indicated that he was potentially ruling out encephalopathy due to her improvement in testing. (Tr. 1264)

### C.     Opinion Evidence

#### 1.     Osama A. Malak, M.D. – June 2012

Dr. Malak completed a lumbar spine impairment questionnaire on June 13, 2012.  (Tr. 1054-1060)  He diagnosed lumbar pain, lesion of sciatic nerve, sacroiliitis, nerve root compression-lumbar and degeneration of the lumbar disc. (Tr. 1054)  Dr. Malak identified clinical findings supporting his conclusions, stating that plaintiff had limited range of motion (flexion and extension); and midline and sacroiliac joint tenderness. (Tr. 1054)  He also indicated that plaintiff had positive Patrick's test on the right. (Tr. 1055)  He reported that Ms. Rieth's primary symptoms were soreness at the right sacroiliac joint region of the spine. (Tr. 1055)  Dr. Malak stated that Ms. Rieth experienced constant pain and that her pain worsened with activities. (Tr. 1056)  He opined that her pain would constantly interfere with her attention and concentration. (Tr. 1058)  He also opined that she was incapable of tolerating even low stress at

work.  (Tr. 1058)  Dr. Malak acknowledged that he performed no functional capacity evaluation, stating that he "does not do this." (Tr. 1059)

### 3.    Dr. Diab Almhana, M.D. – Psychiatric/Psychological – July 2012

On July 10, 2012, Dr. Diab Almhana completed a Psychiatric/Psychological Impairment Questionnaire.  (Tr. 676-683)  Dr. Almhana listed plaintiff's diagnosis as bipolar 1, adjustment disorder and cognitive disorder.  (Tr. 676)  Dr. Almhana reported that plaintiff had poor memory, personality change, mood disturbance, emotional lability, feelings of guilty/worthlessness, difficulty thinking or concentrating, social withdrawal and isolation, blunt, flat or inappropriate affect, and decreased energy.  (Tr. 677)  Dr. Almhana opined that plaintiff had been experiencing these symptoms for 1-2 years. (Tr. 683)

Dr. Almhana opined that Ms. Rieth was markedly limited[1] in her ability to remember locations and work-like procedures, in her ability to understand and remember instructions, in her ability to carry out simple one or two-step instructions, in her ability to carry out detailed instructions, in her ability to maintain attention and concentration for extended periods, in her ability to maintain attention and concentration for extended periods, in her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerance, in her ability to sustain ordinary routine without supervision, in her ability to work in coordination with or proximity to others without being distracted by them, in her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and in her ability to respond appropriately to changes in the work setting.  (Tr. 679-681)  Dr. Almhana

---

[1] In this questionnaire, "markedly limited" is defined as effectively precluding the individual from performing the activity in a meaningful manner.

12

opined that plaintiff was moderately limited[2] in her ability to understand and remember one or two step instructions, her ability to make simple work related decisions, her ability to interact appropriately with the public, her ability to ask simple questions or request assistance, her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, in her ability to be aware of normal hazards and take appropriate precautions, in her ability to travel to unfamiliar places or use public transportation, in her ability to set realistic goals or to make plans independently. (Tr. 679-681)

On the questionnaire, Dr. Almhana circled "Yes" when asked whether Ms. Rieth experienced episodes of deterioration or decompensation in work or work like settings which caused her to withdraw from that situation and/or experience exacerbation of signs and symptoms. (Tr. 681) Dr. Almhana opined that Ms. Rieth was likely to be absent from work more than three times a month as a result of her impairments or treatment. (Tr. 683)

Dr. Almhana completed another Mental Impairment Questionnaire on March 12, 2015. (Tr. 1399-1403) When the questionnaire was completed, Ms. Rieth's most recent visit with Dr. Almhana had been January 7, 2015. (Tr. 1399) Plaintiff's diagnosis, medications and clinical findings were the same as in the first questionnaire. (Tr. 1399) Dr. Almhana opined that plaintiff's symptoms and limitations dated back as far as February 19, 2009. (Tr. 1403) In this questionnaire, Dr. Almhana opined that plaintiff had marked limitation[3] in the following areas: remembering locations and work-like procedures, understanding and remembering detailed instructions, carrying out simple, one-to-two step instructions, carrying out detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule and consistently being punctual, sustaining ordinary routine without supervision,

---

[2] "Moderately limited" is defined as significantly affecting but not totally precluding the individual's ability to perform the activity.
[3] "Symptoms constantly interfere with ability (Constant – more than 2/3 of an 8-hr. workday.)"

13

working in coordination with or near others without being distracted by them, making simple work-related decisions, completing a workday without interruptions from psychological symptoms and performing at consistent pace without rest periods of unreasonable length or frequency.  (Tr. 1402)  Dr. Almhana opined that plaintiff had moderate-to-marked limitations in the following areas:  understanding and remembering one-to-two step instructions and responding appropriately to workplace changes.  (Tr. 1402)  Dr. Almhana opined that Ms. Rieth would be moderately limited in her ability to accept instructions and to respond appropriately to criticism from supervisors, in getting along with coworkers or peers without distracting them, in being aware of hazards and taking appropriate precautions, in traveling to unfamiliar places or using public transportation, in setting realistic goals and in making plans independently.  (Tr. 1402)  However, Dr. Almhana opined that plaintiff was unlimited or had mild limitations in her ability to interact appropriately with the public, in asking simple questions or requesting assistance, in maintaining socially appropriate behavior and in adhering to basic standards of neatness.  (Tr. 1402)   Dr. Almhana opined that Ms. Rieth would be absent from work more than three times a month.  (Tr. 1403)

### 4.    Dr. Phillip DeMio – June 2013 & September 2013

Dr. DeMio completed a Lyme Disease Impairment Questionnaire on June 18, 2013.  (Tr. 744-752)  Dr. DeMio listed plaintiff's diagnosis as pain, infectious disease abnormal testing (Lyme, fungal, mycoplasma and human herpesvirus 6.)  (Tr. 744)  He identified his clinical findings supporting his diagnosis as cognitive dysfunction, right shoulder pain and dysfunction, spinal pain and dysfunction, neuropathic pain and dysfunction with cognitive limitation and pain on range of motion of shoulder and back.  (Tr. 744)  Ms. Rieth's primary symptoms were listed as fatigue, mental confusion, cognitive dysfunction, neuropathic pain and alteration of sensation

14

with loss of sensation.  (Tr. 745)  Dr. DeMio opined that Ms. Rieth could sit for 0-1 hour and

could stand/walk for 0-1 hour in an eight hour day.  (Tr. 749)  He opined that she was able to lift

or carry up to five pounds once or twice per day.  (Tr. 749)  He believed she would be unable to

tolerate even low stress due to her fatigue. (Tr. 750)  Dr. DeMio reported that Ms. Rieth required

the use of a cane or other assistance including holding onto her spouse or a wall. (Tr. 751)  Dr.

DeMio opined that Ms. Rieth would be absent from work more than three times per month due to

her impairments or treatment.  (Tr. 751)

Dr. DeMio completed a Multiple Impairment Questionnaire on September 16, 2013.  (Tr.

821-828)  In this questionnaire, Dr. DeMio listed his diagnosis for plaintiff as "Lyme disease."

(Tr. 821)  Much of the information contained in this questionnaire is identical to the opinions

that Dr. DeMio provided in his earlier questionnaire.  Dr. DeMio also opined that Ms. Rieth's

pain, fatigue and other symptoms would constantly interfere with her attention and

concentration.  (Tr. 826)

### 5.  State Agency Medical Consultants

Dr. Leanne Bertani, medical consultant for the agency, reviewed plaintiff's file in July

2012.  Dr. Bertani opined that plaintiff could physically perform a reduced range of light work.

(Tr. 160-161)  On reconsideration, Dr. Anton Friehofner reviewed plaintiff's medical records in

November 2012 and agreed with Dr. Bertani's opinion.  (Tr. 174-175)

### 6.  State Agency Psychological Consultants

Katherine Fernandez, Psy.D., a psychological consultant for the agency, reviewed

plaintiff's records in July 2012 and opined that plaintiff could perform unskilled work with

provisions made for some of her social limitations. (Tr. 158-159)  On reconsideration, Leslie

15

Rudy, Ph.D., reviewed plaintiff's records in November 2012 and agreed with Dr. Fernandez's opinion.  (Tr. 174-175)

      **D.**    **Testimonial Evidence**

      **1.**    **Testimony of Diana Rieth**

The hearing in this matter commenced on October 11, 2013 and continued on March 26, 2014.  (Tr. 93, 42)  The hearing was continued so that the ALJ could gather some additional medical records.  (Tr. 45)  Ms. Rieth testified that she was bitten by a tick in 2001 and that she went to St. John West Shore hospital after being bitten.  (Tr. 99)  When she went to the emergency room, she denied any recent travel.  (Tr. 77)  However, at the hearing she explained that she had gone to Florida and to Pennsylvania and did not feel that reporting these travels to the emergency room doctor was necessary.  (Tr. 77)  She testified that she had the classic red bull's eye marking but that she did not remember being bitten by a tick.  (Tr. 101)  She remembered that the ER doctor said that her bite looked like Lyme disease but that Lyme disease could not be contracted in Ohio.  (Tr. 101)  She further stated that the ER doctor who treated her in 2001 was not educated about Lyme disease.  (Tr. 101)

Ms. Rieth believed that she had contracted Lyme disease in 2001, that she was still suffering from chronic Lyme disease, and that she also had co-infections that are associated with the tick bite and Lyme disease.  (Tr. 101)  Ms. Rieth testified that, in addition to Lyme disease, she also had babesiosis, mycoplasma pneumoniae, and herpesvirus 6.  (Tr. 101)  She was treating with Dr. DeMio for her conditions.   (Tr. 112)  Plaintiff had a PICC line installed from which she received IV treatments every day prescribed by Dr. DeMio. (Tr. 57)  She sought treatment with Dr. DeMio because she believed that he was "Lyme literate."  (Tr. 112)

Ms. Rieth testified that her disability began in 2009 when she developed chronic fatigue. (111)  She could not continue working after 2009.  (Tr. 111)  Prior to that, Ms. Rieth worked for one year as a deburrer for a company called International Machine.  (Tr. 118)  She stated that she left that job because she was not getting along with some of the people there.  (Tr. 119)  Prior to that, she was working for a temporary agency, Superior Payroll Processing, doing work pulling parts and taking them to workers and occasionally assembling.  (Tr. 124-127)

In 2002 and 2003, Ms. Rieth attempted to take college courses at a community college. (Tr. 128)  She tried to obtain a degree or an associate's degree, in a field that she hoped would require less physical work on her part.  (Tr. 128-129)

Ms. Rieth had also previously worked at York International on an assembly line wiring furnaces.  (Tr. 129)  At that job, she was not required to lift anything heavier than a needle nose tool for wiring, which weighed approximately five pounds.  (Tr. 130)  She also operated a towmotor at York International, which moved heavy furnaces.  However, she was not required to physically lift anything; the forklift did all the lifting.  (Tr. 132)

When questioned about the symptoms she was experiencing, Ms. Rieth testified that she had a low-grade fever every day, joint and muscle pain, insomnia, headaches, and exhaustion. (Tr. 54)  She also experienced shaking and tremors.  (Tr. 54)  She testified that she had troubles with her cognitive abilities.  (Tr. 54, 56)  She had trouble concentrating and thinking. (Tr. 60) Plaintiff felt sharp pain in her right lower back.  (Tr. 58)  She was also depressed.  (Tr. 59)

Plaintiff estimated that she could stand for twenty minutes at a time.  (Tr. 61)  She also testified that she was unable to sit comfortably for any length of time.  She needed to constantly shift.  (Tr. 62)  She estimated that she would be able to sit for about fifteen minutes before experiencing great pain and stiffness. (Tr. 62)

17

Plaintiff usually got out of bed in the morning between 8:00 a.m. and 9:00 a.m. (Tr. 64) She became extremely exhausted around 1:00 p.m. each day. (Tr. 64) Plaintiff tried to make dinner every day. (Tr. 65-66) She was capable of doing laundry if she sat while she was doing it. (Tr. 66-67) She was capable of vacuuming for about five minutes at a time, but it made her tired. (Tr. 66-67) She was capable of shopping for small items but tried to choose stores that were smaller so that she would not be required to walk as much. (Tr. 67) She was capable of helping in the yard a little; she had helped her husband in the spring with weeding. (Tr. 68) She had pulled weeds in a seated position for about fifteen minutes at a time. (Tr. 68)

Plaintiff acknowledged that a second test performed by Dr. Litwin had shown improvements in her cognitive abilities. (Tr. 73) Plaintiff believed that she had experienced a period of time where her cognitive abilities seemed to improve when she was taking medication to address her "bobesia" or babesiosis. (Tr. 72) She described "bobesia" as a condition that involves a "bug that is in [her] brain." (Tr. 72) Dr. DeMio had stopped prescribing the medicine that treated babesiosis because he suspected that it may have been causing her irregular heartbeats. (Tr. 72) She felt that her cognitive abilities had worsened again after she stopped taking the medication for babesiosis. (Tr. 72)

### 2. Testimony of Vocational Expert

Ted Macy, a vocational expert ("VE"), testified at plaintiff's hearing. (Tr. 136-140, 82-89) Mr. Macy considered plaintiff's past relevant work to be a deburrer, a stock selector, a towmotor or forklift operator, and a production worker. (Tr. 137-140, 52-53) He did not believe that plaintiff would be capable of performing any of her past work. (Tr. 83)

Given the nature of the objections to the ALJ's findings alleged by plaintiff, there is no need to set forth the details of the VE testimony. Suffice it to say, he responded to the ALJ's

18

hypothetical questions by indicating that someone like plaintiff could perform light exertional

work with certain limitations.  He indicated that there were jobs locally and nationally of

wireworker, electronics worker, and assembly press operator.  He indicated there would be other

jobs someone with the hypothetical worker's qualifications could perform as well.  The VE

acknowledged that when added limitations proposed by plaintiff's counsel were added to the

hypothetical questions, there would be no jobs available.  Plaintiff does not take issue with the

opinions of the VE.  Instead, she challenges other aspects of the ALJ's analysis and conclusions.

The court's time would not be productively used in reciting or reviewing further details of the

VE's opinions.

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[4]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations. The five steps can be

summarized as follows:

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V. The ALJ's Decision

The ALJ issued a decision on August 22, 2014. A summary of her findings is as follows:

1. Ms. Reith met the insured status requirements of the Social Security Act through September 30, 2014. (Tr. 23)

2. Ms. Rieth had not engaged in substantial gainful activity since February 19, 2009, the alleged onset date. (Tr. 23)

3. Ms. Rieth had the following severe impairments: depression, anxiety and lumbago. (Tr. 23)

4. Ms. Rieth did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 24)

20

5.  Ms. Rieth had the residual functional capacity to perform light work, except she could only occasionally climb ramps, stairs, ladders, ropes and scaffolds; could only occasionally stoop; was unlimited in her ability to kneel, balance, crouch and crawl; could understand, remember and carry out instruction consistent with performing work that could be learned within thirty days or with a short demonstration; could maintain concentration, persistence or pace for work that was consistent with performing work that could be learned within thirty days or with a short demonstration. Her work could not require fast-paced mechanized production quotas.  She could interact with general public up to occasionally and could interact with co-workers and supervisors to speak, signal, take instructions and carryout instructions; and she was limited to work that was routine in nature. (Tr. 26-27)

6.  Ms. Rieth was unable to perform past relevant work. (Tr. 32)

7.  She was born on July 25, 1962 and was 46 years old on the alleged disability date.  Thus she was considered a younger individual age 18-49.  She later changed age categories to closely approaching advanced age.  (Tr. 32)

8.  Ms. Rieth had at least a high school education and was able to communicate in English. (Tr. 32)

9.  Transferability of job skills was not an issue because Ms. Rieth was not disabled whether or not she had transferable job skills. (Tr. 32)

10. Considering Ms. Rieth's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform.  (Tr. 32)

Based on the foregoing, the ALJ determined that Ms. Rieth had not been under a disability from February 19, 2009, the alleged onset date, through the date of the ALJ's decision. (Tr. 33)

## VI.    The Parties' Arguments

Plaintiff filed her brief on July 7, 2016.  (ECF Doc. No. 10)  Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence.  Plaintiff contends that the ALJ should have assigned controlling weight to the opinion of Dr. Almhana, plaintiff's treating psychiatrist and to her treating physicians, Dr. Malak and Dr. DeMio.  However, the ALJ assigned little weight to the treating physicians' opinions while assigning great weight to the non-examining

21

state agency physicians and some weight to the opinions of the non-examining state agency

psychologists.  Plaintiff also argues that the ALJ failed to articulate good reasons for assigning

little weight to the opinions of plaintiff's treating physicians.  Plaintiff also asserts that the ALJ

failed to properly evaluate her credibility.

Defendant filed a brief on September 6, 2016.  (ECF Doc. No. 12)  Defendant contends

that substantial evidence supports the ALJ's finding that plaintiff failed to establish the she had

Lyme disease as a medically determinable impairment.  Defendant also argues that there was

substantial evidence supporting the ALJ's determination of plaintiff's credibility.  Finally,

defendant contends that substantial evidence supported the ALJ's reasons for not assigning

significant weight to the opinions of Dr. Almhana, Dr. Malak, and Dr. DeMio.

**VII.    Law & Analysis**

    **A.    Standard of Review**

This court's review is limited to determining whether there is substantial evidence in the

record to support the ALJ's findings of fact and whether the correct legal standards were applied.

*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed

if the administrative law judge's findings and inferences are reasonably drawn from the record or

supported by substantial evidence, even if that evidence could support a contrary decision.");

*Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and*

*Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court also must determine whether the ALJ decided the case using the correct legal standards. If not, the decision must be reversed. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D.

Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant whose application has been denied understands why.

      **B.**     **Treating Physician Rule**

           **1.**     **Dr. Diab Almhana**

The ALJ assigned little weight to the opinion of Dr. Almhana, plaintiff's treating psychiatrist.  In considering Dr. Almhana's opinion, the ALJ stated:

> Dr. Diab Almhana's treatment notes show the claimant's cognitive function, memory and associated abilities are repeatedly noted as being intact and age appropriate.  Yet, he then went on to describe the claimant as having marked limitations in almost all areas of understanding/memory and sustained concentration and persistence.  He also reported that the claimant's social interactions were mild to moderately limited, her adaptation was moderately to markedly limited, and she would likely be absent from work more than three days per month.  He later reported that the claimant's ability to work is impaired and she will not be able to work daily largely in part due to her" cognitive ability and chronic nature of mental illness and Lyme disease/chronic pain/system symptoms."  As noted, all reasonably accepted objective evidence was negative for Lyme disease and Dr. Almhana's treatment records repeatedly indicate age-appropriate cognitive function and normal memory.  Consequently, the undersigned gave those opinions little weight due to the inconsistence with [Dr. Almhana's] own treatment notes and observations, which are clearly more reliable based on the frequency and repetition noted.

(Tr. 30)

Evidence from treating doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  The ALJ must examine what work the treating source performed. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The treating physician rule requires that

"[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account how long and how frequently the doctor treated the patient, how well supported the opinion is, and whether the opinions of the source are consistent with the totality of the medical evidence in the record.  The ALJ must also pay attention to whether the doctor is a specialist in the field of medicine in which she/he is expressing an opinion. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007).  The Sixth Circuit Court of Appeals "do[es] not

hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given

to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions

from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661

F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original)

(internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996

WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> The conflicting substantial evidence must consist of more than the medical
> opinions of the nontreating and nonexamining doctors. Otherwise the treating-
> physician rule would have no practical force because the treating source's opinion
> would have controlling weight only when the other sources agreed with that
> opinion. Such a rule would turn on its head the regulation's presumption of giving
> greater weight to treating sources because the weight of such sources would hinge
> on their consistency with nontreating, nonexamining sources.

*Id.* at 377. On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor

analysis." See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Here, the ALJ assigned little weight to the opinion of Dr. Almhana because the ALJ

determined that Dr. Almhana's opinions were inconsistent with his own treatment notes and

observations. The ALJ pointed to the fact that Dr. Almhana's notes repeatedly stated that

plaintiff's cognitive function, memory and associative abilities were intact and age appropriate.

The ALJ also noted that the objective evidence was negative for Lyme disease. (Tr. 30)

The ALJ did not adequately explain in what ways Dr. Almhana's opinions were

inconsistent with his own treatment notes. Although Dr. Almhana's office notes frequently state

that cognitive functioning and short and long term memory was intact, Dr. Almhana's notes also indicate that plaintiff was having difficulties in her cognitive functioning and memory. (Tr. 478, 776)  For example, on September 29, 2011, Dr. Almhana indicates that plaintiff's first problem was fatigue/memory loss/face numbness.  (Tr. 478)  On August 12, 2012, Dr. Almhana notes that plaintiff's first problem was depression and that her second problem was cognitive difficulty. (Tr. 776)  Dr. Almhana's diagnosis includes "cognitive disorder, NOS." (Tr. 776)  Dr. Almhana's progress notes document the fact that plaintiff was having difficulty in cognitive functioning and memory.  Thus, the ALJ painted with too broad a brush when she concluded that the office notes only contained one viewpoint of Dr. Almhana.  In fact, Dr. Almhana's opinions were consistent with his notes which consistently documented plaintiff's problems in the areas of cognitive functioning and memory.  Other chart notes indicated more benign findings.  If any inconsistencies existed in  Dr. Almhana's views, it appears that the inconsistencies were contained within the treatment notes and observations themselves.  Dr. Almhana's opinions are consistent with much of what is found in his treatment notes.  Unfortunately, rather than finding that his notes contained contradictions, the ALJ simply concluded that Dr. Almhana's notes and observations were uniform and "clearly more reliable"  than his opinions, without saying why. The ALJ never dealt with the portions of the doctor's treatment notes that were perfectly consistent with his opinions.  (Tr. 30)

In addition, before assigning "little weight" to Almhana's opinions, the ALJ did not discuss any other factors, such as length of the treatment, frequency of the treatment relationship, the supportability of the opinions, the consistency of the opinion with the record as a whole, or whether Dr. Almhana is a specialist.

The regulations require "good reasons" to be given when a treating doctor's opinions are not given controlling weight for two reasons,  First, a clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that her physician has deemed her disabled and therefore "might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied."  *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544).  Second, the giving an explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.

Sometimes, an ALJ's failure to give "good reasons" for rejecting a treating physician opinion is "harmless error."  Harmless error can be found when: (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation."  *Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating

physician's opinion, strict compliance with the rule may sometimes be excused." *Friend,* 375 Fed. Appx. at 551.

Here, the ALJ's reasons for discounting the opinion of Dr. Almhana, were inadequate. The ALJ's determination that Dr. Almhana's treatment notes (which the ALJ determined were "clearly more reliable") contradicted his opinions about plaintiff's limitations oversimplified the content of Dr. Almhana's progress notes.  Moreover, the ALJ decision does not reflect that she fully considered all of the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6), including the length of treatment or the supportability of the record as a whole.  For these reasons, the undersigned finds that the ALJ's failure to provide sufficiently specific "good reasons" for assigning little weight to Dr. Almhana's opinions on Ms. Rieth's limitations was not harmless error.  Even if there were good reasons to reject Dr. Almhana's opinion, the ALJ failed to articulate those reasons with sufficient specificity so as to allow for meaningful review.

### 2.  Dr. Osama A. Malak

Plaintiff also argues that the ALJ improperly assigned little weight to the medical opinion of treating pain management specialist, Dr. Malak.  (ECF Doc. No. 10, pp. 21-22)  As to Dr. Malak's opinion, the ALJ stated,

> The record also contains notations by Dr. Osama Malak describing the claimant as suffering from "chronic disabling pain which has caused psychological, social and physical impairment."  He later reported that the claimant was constantly experiencing severe pain/symptoms and was incapable of even low stress work. However, he refused to complete a residual functional capacity questionnaire.  As opinions, these statements [are] accord[ed] little weight due to the inconsistency with the record and fact that findings of disability are reserved solely for the Commissioner.

(Tr. 31)

Plaintiff argues that the ALJ erred in assigning little weight to Dr. Malak.  Plaintiff acknowledges that "findings of disability are reserved solely for the Commissioner."  However,

29

plaintiff points out that the ALJ may not reject a valid medical opinion just because the Commissioner has the final decision-making power on whether someone is disabled. (Doc. 10, p. 21) Plaintiff argues that Dr. Malak's opinion was well supported with medical findings throughout the record. Plaintiff also contends that the ALJ did not provide good reasons for discounting the opinion of Dr. Malak. Plaintiff points out that an ALJ may not rely on the opinions of consulting physicians to the exclusion of a well-supported opinion of a treating physician.

As with her rejection of the opinion of Dr. Almhana, the ALJ has not provided a sufficient explanation of her decision to assign little weight to Dr. Malak's opinions. The ALJ only stated that the doctor refused to complete a residual functional capacity questionnaire and that his opinions were inconsistent with the record as a whole. (Tr. 31) It is true that Dr. Malak did not fully complete the questionnaire regarding plaintiff's ability to sit/stand/lift etc. (Tr. 1056-1057, 1059) But in the portions of the questionnaire that he did fill out, Dr. Malak plainly indicated that his patient experienced constant pain requiring injections when severe; that her symptoms were precipitated by activities of daily living; that her symptoms were not completely relieved with medication; and that she was unable to tolerate work stress. (Tr. 1054-1058) Dr. Malak's diagnosis of plaintiff's condition was lumbar pain, lesion of sciatic nerve, sacroiliitis nerve root compression and degeneration of her lumbar disc. (Tr. 1054) He cited clinical findings in support of his diagnosis and his opinions regarding plaintiff's physical limitations. (Tr. 1054-1055)

If there were good reasons for refusing to assign controlling weight to Dr. Malak's opinion, we don't know what they are; the ALJ did not provide an adequate explanation of her decision. Moreover, the ALJ did not defer or assign weight to Dr. Malak's opinion which took

into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, or whether the Dr. Malak was a specialist. The ALJ merely stated that Dr. Malak's opinion was inconsistent with the record, but did not say how. Accordingly, the ALJ's decision not to accord controlling weight to the Malak opinions does not provide an adequate explanation for the claimant and does not permit this court to meaningfully review the decision.

It appears the ALJ discounted Dr. Malak's opinions, in part, on the authority of the opinions of the reviewing medical consultants, Dr. Leanne Bertani and Dr. Anton Freihofner. (Tr. 29) The ALJ assigned great weight to those opinions, stating that they were "consistent with the objective evidence *** without being overly reliant on the claimant's subjective statements." (Tr. 29) The ALJ may not decide that a treating doctor's opinions are inconsistent with the record based on a comparison to the medical opinions of non-examining doctors. *Gayheart,* 710 F.3d at 375-376. Here, the ALJ's failure to provide good reasons for the weight she assigned to Dr. Malak's opinion supports plaintiff's speculation that she rejected his opinion in favor of the opinions provided by the non-examining physicians.

### 3. Dr. Phillip DeMio

Finally, plaintiff argues that the ALJ improperly weighed the opinion evidence of Dr. Phillip DeMio. Plaintiff argues that the ALJ grossly mischaracterized the record by concluding that Dr. DeMio's opinions were based primarily on Ms. Rieth's subjective complaints. (Doc. 10, p. 23-24) Plaintiff states that Dr. DeMio's findings were based on abnormal infectious disease testing as well as clinical evidence of multiple dysfunctions of the body and mind. (Id.) Plaintiff argues that Dr. DeMio's findings were consistent with the opinions of the treating pain management specialist, Dr. Malak, and should have been assigned controlling weight. Plaintiff

31

also argues that the ALJ failed to provide good reasons for rejecting Dr. DeMio's opinions. (Id.)

The Commissioner's brief contends that Dr. DeMio either used non-standard testing or

interpreted the available testing in a non-standard way.  (ECF Doc. No. 10, page ID#1560)  The

Commissioner also points to the multiplicity of diagnostic test results that were negative for

Lyme disease and to the negative opinion of infectious disease specialist Dr. Christine Koval (Tr.

439) to support the contention that the ALJ's decision not to give controlling weight to Dr.

DeMio's opinions was supported by substantial evidence.

> Regarding Dr. DeMio's opinions, the ALJ stated:
>
> Dr. Phillip C. DeMio, the claimant's physician offered several opinions, which
> indicate the claimant is permanently disabled due to 10/10 pain and chronic Lyme
> disease.  As noted, all objective testing from other sources has been negative for
> Lyme disease.  Despite that, he describes her condition as disabling and notes
> extreme limitations of 10/10 daily pain, inability to lift/carry more than five
> pounds once or twice daily, and that she is unable to sit/stand/walk more than an
> hour in an eight-hour day.  Furthermore, he reported that the claimant has had this
> level of limitation since the year 2000.  This clearly shows that he relied quite
> heavily on the subjective report of symptoms and limitations provided by the
> claimant, and seemed to uncritically accept as true most, if not all, of what the
> claimant reported.  Yet, as explained elsewhere in this decision, there exist good
> reasons for questioning the reliability of the claimant's subjective complaints.
> The fact remains that the claimant was clearly able to engage in substantial
> gainful activity *for years,* during the period that he reported she was permanently
> disabled and unable to perform any competitive work.

(Tr. 31)

After examining plaintiff's medical records, the ALJ concluded that plaintiff does not

have Lyme disease.  (Tr. 23, 30)  There is evidence in the record supporting this conclusion and

the ALJ's findings are not subject to reversal merely because evidence existed in the record

supporting a different conclusion.  (Tr. 23-24); *Buxton,* 246 F.3d at 772-773.  Nonetheless, the

ALJ was required to complete the *Wilson* analysis by determining the weight to be given to Dr.

DeMio's opinions after balancing the factors discussed above and by giving good reasons in her

decision for the weight given the treating source's opinion.  *Wilson,* 378 F.3d at 541-545.  The ALJ did not do this.  The ALJ did not indicate what weight she assigned to Dr. DeMio's opinions or give any reasons for that weight.  Thus, she did not "build an accurate and logical bridge between the evidence and the result."  *Fleischer,* 774 F.Supp.2d at 877.

Because the ALJ did not correctly handle the evidence from the treating source physicians, the undersigned recommends that the decision of the Commissioner be reversed and that this matter be remanded for further proceedings consistent with this report and recommendation.

### C.      Credibility of Ms. Rieth

Plaintiff also contends that the ALJ didn't evaluate plaintiff's credibility correctly.  (ECF Doc. No. 10, pp. 24-28)  She argues that the ALJ's credibility assessment was not supported by substantial evidence in the record.  Plaintiff also contends that the ALJ improperly relied on her own observations of plaintiff's behavior during the hearing and isolated evidence from the record to conclude that plaintiff's testimony was not completely reliable.  (Doc. 10, pp. 25-27)

It is for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th  Cir. 1997); *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524, 538 (6th Cir. 1981).  However, the ALJ cannot decide credibility based solely upon an "intangible or intuitive notion about an individual's credibility."" Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4.  Rather, such determinations must find support in the record. Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of

33

the entire case record." *Rogers v. Comm'r of Soc. Sec.* 486 F.3d 234, 247 (6th Cir. 2007).  The

entire case record includes any medical signs and lab findings, the claimant's own complaints of

symptoms, any information provided by the treating physicians and others, as well as any other

relevant evidence contained in the record.  The consistency of the various items of information

contained in the record must be scrutinized.  Consistency between a claimant's symptom

complaints and the other evidence in the record tends to support the credibility of the claimant,

while inconsistency, although not necessarily defeating, should have the opposite effect.  *Id.*

Social Security Ruling 96-7p also requires that the ALJ explain the credibility

determination in a way that it "must be sufficiently specific to make clear to the individual and to

any subsequent reviewers the weight the adjudicator gave to the individual's statements and the

reasons for that weight."  *Id*.  In other words, blanket assertions that the claimant is not

believable will not pass muster, nor will explanations as to credibility that are not consistent with

the entire record and the weight of the relevant evidence. *Id*.

Here, plaintiff contends that the ALJ improperly considered her own observations of

plaintiff's abilities during the hearing and only isolated pieces of evidence in the record when

making her credibility assessment.  A review of the ALJ's decision leads to the opposite

conclusion.  The ALJ cited many facts to support her credibility assessment:

> There are numerous inconsistencies noted in the claimant's allegations.  While the
> claimant reported that she has disabling memory loss, there were no significant
> limitations noted during either hearing and she was able to recall dates and events,
> and stay on task with no significant problems observed.  As noted, the claimant's
> account of contracting Lyme disease and having "chronic Lyme disease" is
> inconsistent with the evidence of record.  While she reported that she stopped
> working in February 2009 due to her conditions, the record notes that she was laid
> off.  She testified that she is unable to watch TV or retain anything she reads and
> yet initially reported that she could watch TV, read and use the computer fine for
> short periods until she got tired.  She testified that [sic] has limited contact with
> friends and does not go out with her friends, and yet initially reported she talks on
> the phone and visits with others every other day and goes out for dinner once a

> month. Although these inconsistencies may not be the result of a conscious
> intention to mislead, nevertheless they suggest that the information provided by
> the claimant generally may not be patently reliable.

(Tr. 27-28)

The ALJ also pointed to specific inconsistencies between plaintiff's testimony and the medical records to support her credibility conclusion. For example, Ms. Rieth alleged that she had pain in every joint, constant tremors, and skin pain. However, the ALJ pointed to several instances in her medical records where plaintiff complained of pain rated no more than 4/10 or where she denied any muscular or joint problems. (Tr. 28) Plaintiff alleged that her pain was constant, but the ALJ pointed to medical records where she reported no chronic pain or failed to demonstrate plain when evaluated or treated. (Tr. 28) The ALJ cited a treatment note that states that plaintiff "categorically denies any significant muscle aches and pains. She is able to climb stairs without difficulty. She has not had any joint pains or rash." (Tr. 28) The claimant reported that she had issues with depression and anxiety, but the ALJ pointed to portions of the record showing that plaintiff's bipolar disorder was repeatedly described as "in remission" and that her medications had been reduced. (Tr. 29) Plaintiff reported debilitating mental impairments but the ALJ noted that she had taken some college courses in 2011, years after she allegedly contracted Lyme disease. (Tr. 29) In short, the undersigned finds that the ALJ sufficiently explained why she did not find plaintiff's allegations to be fully credible.

Plaintiff argues that the ALJ focused on isolated facts and her own observations. The undersigned disagrees. Moreover, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001). "There is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773

[internal quotations omitted.] The ALJ provided a clear enough explanation, supported by evidence from the record, to support her credibility finding. Reversal on this basis is unwarranted.

## VIII. Recommendations

The court should find that the ALJ failed to provide good reasons for the weight assigned to the opinions of plaintiff's treating physicians, and the final decision of the Commissioner should be VACATED and that the case REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings.

Dated: March 10, 2017

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).